## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

|                                        |     |                          |
| -------------------------------------- | --- | ------------------------ |
| HPHC INSURANCE COMPANY, INC.,          | )   |                          |
|                                        | )   |                          |
| Plaintiff,                             | )   |                          |
|                                        | )   |                          |
| v.                                     | )   | Case No. 17-87C          |
|                                        | )   | Judge Lydia Kay Griggsby |
|                                        | )   |                          |
| THE UNITED STATES OF AMERICA,          | )   |                          |
|                                        | )   |                          |
| Defendant.                             | )   |                          |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANT'S CROSS MOTION TO DISMISS

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

ARGUMENT ...................................................................................................... 2

I. THIS COURT HAS JURISDICTION OVER HPIC'S CLAIMS. ................... 2

    A. Jurisdiction Arises Under the Tucker Act. .......................................... 2

    B. HPIC's Claims Are Ripe. ..................................................................... 2

II. HPIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS STATUTORY CLAIM (COUNT I). ..................................................................................... 3

    A. Section 1342 Required Annual RCP Payments. ................................... 6

        *1. Congress Intended Annual RCP Payments.* ............................... 6

        *2. The Government's "Three-Year" Framework Does Not Merit Deference.* ............................................................................... 10

            *a. They lack validity.* ......................................................... 12

            *b. They lack formality.* ...................................................... 12

            *c. They lack thoroughness of reasoning.* ......................... 13

            *d. They contradict earlier statements without explanation.* ............. 13

    B. Section 1342 Required Full Payments Under Its Statutory Formula. ................. 14

        *1. Section 1342 Creates an Unconditional Right to RCP Payments.* .......... 14

        *2. The Government's Liability Does Not Depend on an Appropriation.* ......................................................................... 16

        *3. The Later Spending Laws Did Not Defuse the Payment Obligations.* ............................................................................ 22

III. THE GOVERNMENT IS LIABLE FOR BREACH OF THE IMPLIED-IN-FACT CONTRACT BETWEEN IT AND HPIC (COUNT II). ................................. 23

    A. There Was Mutuality of Intent. .......................................................... 24

    B. There Was Offer and Acceptance. ...................................................... 26

    C. There Was Consideration. ................................................................... 26

    D. The Secretary of HHS Had Actual Authority to Contract. ................. 27

    E. Congress Cannot Abrogate Contractual Liability through Appropriations. ........ 30

IV. CONCLUSION .......................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*AAA Pharmacy, Inc. v. United States*,
108 Fed. Cl. 321 (2012) ........................................................................... 25-26

*Ace-Federal Reporters, Inc. v. Barram*,
226 F.3d 1329 (Fed. Cir. 2000) ................................................................... 27

*Aero Union Corp. v. United States*,
47 Fed. Cl. 677 (2000) ................................................................................. 30

*Army & Air Force Exch. Serv. v. Sheehan*,
456 U.S. 728 (1982) ..................................................................................... 25

*ARRA Energy Co. I v. United States*,
97 Fed. Cl. 12 (2011) .......................................................................24, 25, 26

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................... 30

*AT&T Corp. v. FCC*,
No. 15-1059 (D.C. Cir. Nov. 18, 2016) ...................................................... 14

*Baker v. United States*,
50 Fed. Cl. 483 (2001) ................................................................................. 25

*Brandt v. Hickel*,
427 F.2d 53 (9th Cir. 1970) ......................................................................... 23

*Brooks v. Dunlop Mfg., Inc.*,
702 F.3d 624 (Fed. Cir. 2012) ..................................................................... 25

*California v. United States*,
271 F.3d 1377 (Fed. Cir. 2001) ................................................................... 28

*Cathedral Candle Co. v. U.S. Int'l Trade Comm'n*,
400 F.3d 1352 (Fed. Cir. 2005) .........................................................10, 11, 12

*CBY Design Builders v. United States*,
105 Fed. Cl. 303 (2012) ................................................................................. 3

*Cherokee Nation of Okla. v. Leavitt*,
543 U.S. 631 (2005) ..................................................................................... 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)......................................................................................4, 10

*Christopher v. SmithKline Beecham Corp.*,
    567 U. S. ___ (2012)...........................................................................................13

*Chrysler Corp. v. Brown*,
    441 U.S. 281 (1979)...........................................................................................13

*Coal. for Common Sense in Gov't Procurement v. Sec'y of Veteran Affairs*,
    464 F.3d 1306 (Fed. Cir. 2006)...........................................................................3

*Collins v. United States*,
    15 Ct. Cl. 22 (1879) ...............................................................................16, 18, 21

*Comcast Cable Commc'ns, LLC v. FCC*,
    717 F.3d 982 (D.C. Cir. 2013) ...........................................................................14

*Crandon v. United States*,
    494 U.S. 152 (1990).............................................................................................4

*Encino Motorcars, LLC v. Navarro*,
    No. 15-415 (2016)..............................................................................................11

*Erickson v. Pardus*,
    551 U.S. 89 (2007).............................................................................................30

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009)....................................................................................11, 13

*Fernandez-Vargas v. Gonzales*,
    548 U.S. 30 (2006).............................................................................................23

*Fisher v. United States*,
    402 F.3d 1167 (Fed. Cir. 2005)..........................................................................14

*Gonzales v. Oregon*,
    546 U.S. 243 (2006)...........................................................................................10

*Goodyear Atomic Corp. v. Miller*,
    486 U.S. 174 (1988).............................................................................................9

*Greenlee Cty., Ariz. v. United States*,
    487 F.3d 871 (Fed. Cir. 2007)............................................................................15

*H. Landau & Co. v. United States*,
    886 F.2d 322 (Fed. Cir. 1989)......................................................................27, 28

iv

*Health Republic Ins. Co. v. United States*,
129 Fed. Cl. 757 (2017) ............................................................. *passim*

*Hercules, Inc. v. United States*,
516 U.S. 417 (1996)....................................................................24

*Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*,
48 F.3d 1166 (Fed. Cir. 1995)....................................................20

*INS v. Cardoza-Fonseca*,
480 U.S. 421 (1987)....................................................................14

*Inter-Tribal Council of Ariz., Inc. v. United States*,
125 Fed. Cl. 493 (2016) ...............................................................3

*John Reiner & Co. v. United States*,
325 F.2d 438 (Ct. Cl. 1963) .......................................................29

*Kanemoto v. Reno*,
41 F.3d 641 (Fed. Cir. 1994).......................................................2

*Kilpatrick v. Principi*,
327 F.3d 1375 (Fed. Cir. 2003)....................................................4

*King v. Burwell*,
135 S. Ct. 2480 (2015)....................................................4, 10, 12

*Lamie v. United States Tr.*,
540 U.S. 526 (2004).....................................................................4

*Land of Lincoln Mut. Health Ins. Co. v. United States*,
129 Fed. Cl. 81 (2016), *appeal docketed*, No. 17-1224 (Fed. Cir. Nov. 16,
2016) .....................................................................2, 23, 26

*Landgraf v. USI Film Prods.*,
511 U.S. 244 (1994)....................................................................23

*Lewis v. United States*,
70 F.3d 597 (Fed. Cir. 1995).......................................................24

*Moda Health Plan, Inc. v. United States*,
130 Fed. Cl. 436 (2017) ............................................... *passim*

*Morton v. Ruiz*,
415 U.S. 199 (1974)....................................................................13

*Nat'l Educ. Assoc.-R.I. v. Ret. Bd. of R.I. Emps.' Ret. Sys.*,
890 F. Supp. 1143 (D.R.I. 1995)................................................24

*N.Y. Airways v. United States,*
  369 F.2d 743 (Ct. Cl. 1966) ........................................................26, 28

*N.Y. State Dep't of Soc. Servs. v. Dublino,*
  413 U.S. 405 (1973)....................................................................12

*Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.,*
  470 U.S. 451 (1985)....................................................................24

*Nevada v. Dep't of Energy,*
  400 F.3d 9 (D.C. Cir. 2005) ....................................................18, 28

*OPM v. Richmond,*
  496 U.S. 414 (1990)....................................................................17

*Prairie Cty., Mont. v. United States,*
  113 Fed. Cl. 194 (2013), *aff'd*, 782 F.3d 685 (Fed. Cir. 2015)...........15

*Prairie Cty., Mont. v. United States,*
  782 F.3d 685 (Fed. Cir. 2015) ....................................................17

*Price v. Panetta,*
  674 F.3d 1335 (Fed. Cir. 2012)....................................................14

*Prudential Ins. Co. of Am. v. United States,*
  801 F.2d 1295 (Fed. Cir. 1986)....................................................24

*Radium Mines, Inc. v. United States,*
  153 F. Supp. 403 (Ct. Cl. 1957)...............................................26, 28

*Ransom v. FIA Card Servs., N.A.,*
  562 U.S. 61 (2011).......................................................................4

*Salazar v. Ramah Navajo Chapter,*
  132 S. Ct. 2181 (2012).................................................................30

*Sandifer v. U.S. Steel Corp.,*
  678 F.3d 590 (7th Cir. 2012) ........................................................11

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,*
  559 U.S. 393 (2010).......................................................................9

*Skidmore v. Swift,*
  323 U.S. 134 (1944).................................................................10, 11

*Slattery v. United States,*
  635 F.3d 1298 (Fed. Cir. 2011)......................................... *passim*

*Star-Glo Associates, LP v. United States*,
    414 F.3d 1349 (Fed. Cir. 2005)..............................................................20

*Thomas Jefferson Univ. v. Shalala*,
    512 U.S. 504 (1994).............................................................................14

*Trilon Educ. Corp. v. United States*,
    578 F.2d 1356 (Ct. Cl. 1978)..............................................................29

*U.S. Fid. & Guar. Co. v. United States*,
    209 U.S. 306 (1908).............................................................................23

*U.S. Trust Co. of N.Y. v. New Jersey*,
    431 U.S. 1 (1977).................................................................................24

*United States v. Mead Corp.*,
    533 U.S. 218 (2001).............................................................................11

*United States v. Mitchell*,
    463 U.S. 206 (1983).............................................................15, 17, 18

*United States v. Winstar Corp.*,
    518 U.S. 839 (1996).......................................................................27, 28

*Util. Air Regulatory Grp. v. EPA*,
    134 S. Ct. 2427 (2014)...........................................................................4

*Yosemite Park & Curry Co. v. United States*,
    582 F.2d 552 (Ct. Cl. 1978)................................................................29

**Statutes**

Affordable Care Act

    § 1342.............................................................................................5, 8, 21

    § 1001.....................................................................................................27

    § 1301.....................................................................................................27

    § 1302.....................................................................................................27

    § 1311.....................................................................................................27

2 U.S.C. § 622(2)(A)..................................................................................18

5 U.S.C. § 551............................................................................................13

5 U.S.C. § 553............................................................................................13

28 U.S.C. § 1491(a)(1) .................................................................................2, 24, 25

31 U.S.C. § 1304(a)(1) .........................................................................................21

31 U.S.C. § 1341 ....................................................................................20, 28, 29

42 U.S.C. § 280k(a) .........................................................................................15, 17

42 U.S.C. § 293k-2(e) .....................................................................................15, 17

42 U.S.C. § 300hh-31(a) .................................................................................15, 17

42 U.S.C. § 1397m-1(b)(2)(A) ........................................................................15, 17

Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113) ("2016 Spending Law") .......................................................................................................... *passim*

Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235) ("2015 Spending Law") ..................................................................... *passim*

**Regulations**

45 C.F.R. § 153.510 ...............................................................................6, 10, 14, 27

45 C.F.R. § 156.200 ..............................................................................................26

45 C.F.R. § 156.210 ......................................................................................... 26-27

45 C.F.R. § 156.220 ..............................................................................................27

45 C.F.R. § 156.230 .......................................................................................17, 27

45 C.F.R. § 156.260 ..............................................................................................27

45 C.F.R. § 156.270 ..............................................................................................27

45 C.F.R. § 156.295 ..............................................................................................27

45 C.F.R. § 156.410 ..............................................................................................27

48 C.F.R. § 1.601(a) .......................................................................................27, 29

**Federal Register**

Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment ("Proposed RCP Rule"), 76 Fed. Reg. 41,930 (July 15, 2011) ..............................................................................................8, 12

Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment ("Final RCP Rule"), 77 Fed. Reg. 17,220 (Mar. 23, 2012) ...................................................................................................1, 5, 8, 14

HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. 15,410 (Mar. 11, 2013) ...................................................................................................17

Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240 (May 27, 2014) ...................................................................................... 20-21

**Regulatory Guidance**

CMS, *Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year* (Nov. 18, 2016), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf .......................3

CMS, *Risk Corridors Payment and Charge Amounts for Benefit Year 2014* (Nov. 19, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf ...................................................................................................3

**Other Authorities**

New York Times, *A Quick Guide to Rising Obamacare Rates* (Oct. 25, 2016), *available at* https://www.nytimes.com/2016/10/26/upshot/rising-obamacare-rates-what-you-need-to-know.html?_r=0 ...............................................................7

GAO, Principles of Fed. Appropriations Law ["GAO Redbook"], *available at* https://www.gao.gov/legal/red-book/overview...........................................19, 20, 21

GAO, B-325630, HHS—Risk Corridors Program (Sept. 30, 2014), *available at* http://gao.gov/assets/670/666299.pdf. ...................................................28

GAO, Hon. George E. Danielson, B-173832 (Comp. Gen. Aug. 1, 1975)...................................19

American Academy of Actuaries Individual and Small Group Markets Committee, *An Evaluation of the Individual Health Insurance Market and Implications of Potential Changes* (Jan. 2017), *available at* https://www.actuary.org/files/publications/Acad_eval_indiv_mkt_011817.pdf .......................6

Doug Norris *et al.*, *Risk Corridors under the Affordable Care Act—A Bridge over Troubled Waters, but the Devil's in the Details*, Health Watch (Oct. 2013), *available at* https://www.soa.org/library/newsletters/ health-watch-newsletter/2013/october/hsn-2013-iss73-norris.aspx ...............................................5

Nat'l Ass'n of Ins. Comm'rs, INT 15-01: ACA Risk Corridors Collectability
(Nov. 5, 2015), *available at* http://www.naic.org/documents/committees
_e_app_eaiwg_related_int_1501_risk_corridors.pdf.................................................9

Mem. Op. & Order, *Blue Cross & Blue Shield of N.C. v. United States*, No. 16-651C
(Fed. Cl. Apr. 18, 2017), ECF No. 35...................................................................2, 3

Order, *Maine Cmty. Health Options v. United States*, No. 16-967C (Fed. Cl. Mar.
9, 2017), ECF No. 30 ................................................................................................2

Compl. ¶ 19, *Health Republic Ins. Co. v. United States*,
No. 16-259C (Sweeney, J.), 2017 WL 83818 (Fed. Cl. Jan. 10, 2017), ECF
No. 1...........................................................................................................................7

Tr. of Bench Trial, *United States v. Aetna, Inc., et al.*,
CA No. 16-1494 (Bates, J.) (D.D.C. Dec. 16, 2016).................................................8

# **INTRODUCTION**

The purpose of the Affordable Care Act's ("ACA") Risk Corridors Program ("RCP") was to stabilize premiums during *each* of the first three years of the ACA exchanges. In exchange for insurers participating in entirely new health insurance marketplaces and offering specific benefits to new enrollees for whom there was inadequate actuarial data with which to price premiums, Congress guaranteed that the Government would share the risk in *each* of the first three years of the exchanges. Issuers that experienced higher-than-budgeted costs above a certain level were guaranteed a Government payment to mitigate (not eliminate) the resulting losses. The RCP also obligated QHP issuers to pay *the Government* a portion of gains realized above a certain level.

Absent the RCP, insurers would have had to charge far higher premiums to insulate themselves against the risk of *adverse selection* (new enrollment by previously uninsured individuals disproportionately unhealthier, and thus more expensive to insure, than the existing pool of insureds). Because premiums are set annually, RCP payment calculations—both payments "in" (by QHP issuers) and "out" (by the Government)—were to be made annually.

The RCP was not a new concept. Congress expressly "based" the ACA RCP on the existing Medicare Part D RCP, which has always required payments "in" and "out" to be made annually. The health care industry, Congress, HHS, and CMS understood the RCP's meaning when the ACA was passed in 2010. This is apparent in the Final RCP Rule[1] (issued subject to notice-and-comment rulemaking) which stated that "QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers." 77 Fed. Reg. 17,220, 17,238-17,239 (March 23, 2012).

Below, HPIC (1) opposes the Government's 12(b)(1) motion, (2) reiterates its entitlement

---

[1] Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors, and Risk Adjustment

to summary judgment (Count I) and opposes the Government's 12(b)(6) (and alternatively summary judgment) motion and (3) reiterates its valid claim for breach of implied contract.

## ARGUMENT

### I.    THIS COURT HAS JURISDICTION OVER HPIC'S CLAIMS.

#### A.    Jurisdiction Arises Under the Tucker Act.

This Court has subject-matter jurisdiction over HPIC's statutory claim under the Tucker Act.  *See* Mem. Op. & Order 12-13, *Blue Cross & Blue Shield of N.C. v. United States*, No. 16-651C (Fed. Cl. Apr. 18, 2017), ECF No. 35 ("BCBSNC Order").[2]  The Government challenges jurisdiction by alleging that HPIC is not entitled to payment *now*.  But in so arguing, the Government re-casts a merits-related issue (the right to presently due money) as a jurisdictional one.  The Federal Circuit has rejected this line of argument because "[t]here is no requirement in the Tucker Act that there must be a finding that money is due before the Court of Federal Claims can exercise its jurisdiction," including allegations "that an agency has misinterpreted its statutory mandate to pay out monies."  *Kanemoto v. Reno*, 41 F.3d 641, 647 (Fed. Cir. 1994) (citations and quotations omitted).

The Tucker Act also gives this Court jurisdiction over HPIC's claim for breach of an implied contract.  *See* 28 U.S.C. § 1491(a)(1); *Slattery v. United States*, 635 F.3d 1298, 1317-21 (Fed. Cir. 2011).  Section 1342 gives rise to an implied-in-fact contract between HPIC and the Government, and the Government's failure to make full payments constitutes breach.

#### B.    HPIC's Claims Are Ripe.

The Government's contention that HPIC's claims are not ripe is similarly misplaced.

---

[2]  *See also* Order, *Maine Cmty. Health Options v. United States*, No. 16-967C (Fed. Cl. Mar. 9, 2017), ECF No. 30; *Moda Health Plan, Inc. v. United States*, 130 Fed. Cl. 436, 449-55 (2017); *Health Republic Ins. Co. v. United States*, 129 Fed. Cl. 757, 769-73 (2017); *Land of Lincoln Mut. Health Ins. Co. v. United States*, 129 Fed. Cl. 81, 95-98 (2016), *appeal docketed*, No. 17-1224 (Fed. Cir. Nov. 16, 2016).

HPIC has met the Federal Circuit's two-prong ripeness test of "fitness" and "hardship." *See CBY Design Builders v. United States*, 105 Fed. Cl. 303, 331 (2012).

HPIC meets the "fitness" prong because "further factual development would not significantly advance [this Court's] ability to deal with the legal issues presented." As HHS has conceded, the Government owes HPIC full RCP payments for the 2014 and 2015 plan years and HPIC has not received those payments, and never will under the 2015 and 2016 Spending Laws.[3] *See* BCBSNC Order 10. Indeed, the Government has conceded the precise amounts due.[4] In light of the parties' agreement, there is no "further factual development" that will affect the Court's ability to deal with the issues presented by HPIC's statutory claim. HPIC is owed funds that the Government has not, and will not, pay. HPIC's claims are thus fit for adjudication.

HPIC meets the "hardship" prong because the complained-of conduct has an "immediate and substantial impact" on its operations. *See id.* at 23. The Government's unpaid balance of $19,117,853.55 alone establishes hardship. *See Coal. for Common Sense in Gov't Procurement v. Sec'y of Veteran Affairs*, 464 F.3d 1306, 1316 (Fed. Cir. 2006); *Inter-Tribal Council of Ariz., Inc. v. United States*, 125 Fed. Cl. 493, 504 (2016) ("years of missed payments and lack of security" established hardship by threatening the sustainability of the trust at issue).

## II. HPIC IS ENTITLED TO SUMMARY JUDGMENT ON ITS STATUTORY CLAIM (COUNT I).

Applying the traditional tools of statutory interpretation to the two central issues presented in this case—(1) **when** RCP payments are due (Part II.A) and (2) **whether** full payment is due

---

[3] Consolidated Appropriations Act, 2016 (Pub. L. No. 114-113); Consolidated and Further Continuing Appropriations Act of 2015 (Pub. L. No. 113-235) ("Spending Laws").

[4] *See* Pl.'s Br. 14 (¶ 18); CMS, "Risk Corridors Payment and Charge Amounts for Benefit Year 2014" (Nov. 19, 2015), *available at* https://www.cms.gov/CCIIO/Programs-and-Initiatives/Premium-Stabilization-Programs/Downloads/RC-Issuer-level-Report.pdf; CMS, "Risk Corridors Payment and Charge Amounts for the 2015 Benefit Year" (Nov. 18, 2016), *available at* https://www.cms.gov/CCIIO/Resources/Regulations-and-Guidance/Downloads/2015-RC-Issuer-level-Report-11-18-16-FINAL-v2.pdf.

(Part II.B)—the Court should find that Section 1342 requires full annual payments.

This Court's objective, to discern and give effect to Congress's intent, begins with the statute. *See Ransom v. FIA Card Servs., N.A.*, 562 U.S. 61, 69 (2011); *Lamie v. United States Tr.*, 540 U.S. 526, 534 (2004). Part and parcel to its statutory analysis, the Court must also consider the RCP's purpose and how it fits within the ACA's statutory scheme as a whole. *See King v. Burwell*, 135 S. Ct. 2480, 2492 (2015) ("[T]he words of a statute must be read in their context and with a view to their place in the overall statutory scheme." (quoting *Util. Air Regulatory Grp. v. EPA*, 134 S. Ct. 2427, 2441 (2014) (internal quotations omitted))); *Crandon v. United States*, 494 U.S. 152, 158 (1990) ("In determining the meaning of the statute, we look not only to the particular statutory language, but to the design of the statute as a whole and to its object and policy."); *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 n.9 (1984) ("If a court, employing the traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect."); *Kilpatrick v. Principi*, 327 F.3d 1375, 1384 (Fed. Cir. 2003) ("[I]n determining whether Congress has directly spoken to the point at issue, a court should attempt to discern congressional intent either from the plain language of the statute or, if necessary, by resort to the applicable tools of statutory construction[.]"). Here, HPIC's interpretation of Section 1342's requirements is correct under the plain meaning and the ACA's broader context, whereas the Government's argument would frustrate the ACA's central purpose and objectives.

The RCP— along with the transitional reinsurance program in Section 1341 and the permanent risk adjustment program in Section 1343 (together with RCP referred to as the "3 Rs")— was intended to serve a specific objective within the framework of the ACA: to mitigate the risk that QHP issuers operating on the new exchanges were assuming in light of the ACA's

expansion of myriad coverage requirements and their attendant costs.  *See, e.g.*, 42 U.S.C. § 18021(a)(1)(B) (requiring coverage of "essential health benefits.").[5]  The RCP was one of the enticements that drew insurers such as HPIC into the marketplaces in the first place.[6]  It was designed to operate annually:  annual premium setting, annual enrollment, annual cost calculation, and annual payment—either in or out, depending on how an insurer's final costs compared to its anticipated budget.  Furthermore, the RCP was expressly based on the Medicare Part D RCP—an annual, non-budget neutral program.  The Government has required full and annual payments "in" from QHP issuers that owe RCP payments to the Government.  And the Government itself has made annual "prorated" payments, which reflected only a fraction of the amounts owed.  The Government's conduct in making partial payments *annually*, while conceding that full payment in a specific dollar amount is being recorded as "an obligation of the Government," is inexplicable if payment is not due annually.

The Government ignores the fact that the RCP was created to serve as a risk-sharing program *between* insurers *and the United States*.  *See* Final RCP Rule, 77 Fed. Reg. at 17,220 (noting that the RCP "serves to protect against uncertainty in rate setting by qualified health plans ***sharing risk in losses and gains with the Federal government***." (emphasis added)).  The

---

[5] Final RCP Rule, 77 Fed. Reg. at 17,220 ("These risk-spreading mechanisms [the 3 Rs] . . . are designed to mitigate the potential impact of adverse selection and provide stability for health insurance issuers in the individual and small group markets.").

[6] The Society of Actuaries explained how the RCP was understood when issuers set premiums for the 2014 benefit year:  "The goal of the [RCP] is to protect health insurance issuers against this pricing uncertainty of their plans, temporarily dampening gains and losses in a risk-sharing arrangement between issuers and the federal government. Since the protection is only available for QHPs, it also provides a strong incentive for issuers to participate in the health insurance exchanges set up by the ACA. Lastly, it provides an incentive for issuers to manage their administrative costs optimally."  Doug Norris *et al.*, *Risk Corridors under the Affordable Care Act—A Bridge over Troubled Waters, but the Devil's in the Details*, Health Watch at 5 (Oct. 2013), *available at* https://www.soa.org/library/newsletters/ health-watch-newsletter/2013/october/hsn-2013-iss73-norris.aspx.

Government argues that the RCP is a risk-sharing program merely between insurers and insurers. *See* Def.'s Opp. To Pl.'s Mot. Partial Summ. J. ("Govt. Br.") 7 (representing that "amounts collected from profitable insurers are used to fund payments to unprofitable insurers"). While nominally acknowledging the RCP's premium-stabilizing purpose (Govt. Br. 6), the Government advances a position that is flatly inconsistent with it. After Congress passed the ACA, HHS promulgated implementing regulations (after taking comment from the public and from industry) in complete alignment with the RCP's statutory text. 45 C.F.R. § 153.510(b) ("QHP issuers will receive payment from HHS . . . When a QHP's allowable costs *for any benefit year* are more than [specified percentages], *HHS will pay the QHP issuer* [a specified percentage of the losses]") (emphases added).

Only *after* insurers such as HPIC had already set premiums, entered the exchanges, and enrolled millions of new customers—and years after the passage of the ACA—HHS modified its position in sub-regulatory guidance issued *during* the 2014 benefit year. As explained below, the results have been disastrous: the Government's failure to make annual full payments has *destabilized* the market, causing issuers to exit the exchanges and become insolvent.[7]

### A. Section 1342 Required Annual RCP Payments.

#### 1. *Congress Intended Annual RCP Payments.*

The Government says it need not make annual payments because Section 1342 does not contain an explicit payment deadline. But an analysis that stops there would ignore all of the

---

[7] American Academy of Actuaries Individual and Small Group Markets Committee, *An Evaluation of the Individual Health Insurance Market and Implications of Potential Changes*, at 13, 16 (Jan. 2017) (Noting that issuer participation in exchanges declined between 2015 and 2016 due to the failure of issuers and adverse financial conditions and explaining that "[t]he failure to pay the full [RCP] amounts led to financial difficulty for many plans, in particular many Consumer Operated and Oriented Plans (Co-Ops). For instance, the Kentucky Health Cooperative specifically cited the lack of full risk corridor payments as a reason for closure."), *available at* https://www.actuary.org/files/publications/Acad_eval_indiv_mkt_011817.pdf.

tools of statutory interpretation, *and* ignore the elephant in the room: *the RCP's purpose*. Congress intended for the Government to share in insurers' risk and mitigate (not eliminate) their losses in each of the first three years of the RCP in order to (1) attract insurers to the exchanges and (2) make affordable coverage available to millions of previously uninsured Americans. The RCP was created to stabilize premiums by giving insurers some confidence that, if their calculations proved wrong, the Government would mitigate their losses (not guarantee profits or allow them to break even, as the Government improperly asserts). It afforded issuers the ability not to pass all of the risk along to their consumers in the form of unaffordable premiums that "priced in" every dollar of uncertainty. Anything other than annual payments would not provide the intended risk-sharing.

And it can hardly be doubted *at this point* that the Government's failure to honor this commitment has caused the exchanges to experience exactly what Congress intended to avoid: insurers dropping out of the program or becoming insolvent, and skyrocketing premiums. The sheer number of health plans that went out of business operating on the exchanges evidences the impact of the Government's *current* interpretation.[8] Ruling against the Government on the question of annual payment, Judge Sweeney stated: "If these programs did not provide for prompt compensation to insurers upon the calculation of amounts due, insurers might lack the resources to continue offering plans on the exchanges," and "one of the goals of the [ACA]—the creation of 'effective health insurance markets,' [§ 18091(2)(I)–(J)]—would be unattainable." *Health Republic*, 129 Fed. Cl. at 776. The plaintiff in that case, Health Republic, went into receivership following the Government's refusal to make full RCP payments. *See* Compl. ¶ 19,

---

[8] *Supra* note 7; *see also* New York Times, "A Quick Guide to Rising Obamacare Rates" (Oct. 25, 2016), *available at* https://www.nytimes.com/2016/10/26/upshot/rising-obamacare-rates-what-you-need-to-know.html?_r=0 (noting that many insurers "have either left the market or have had to raise their prices sharply to cover the cost of providing coverage").

*Health Republic Ins. Co. v. United States*, No. 16-259C (Feb. 24, 2016), ECF No. 1.

HHS has acknowledged this fact. Testifying under oath in federal court in mid-December 2016, Kevin Counihan—then HHS's Director and Marketplace CEO at CMS—acknowledged that the Government's "non-payment of the risk corridor payments" in 2014 (beyond the partial 12.6% payment) "*had a deleterious effect on the solvency of some insurance companies.*" Tr. of Bench Trial 2612:9-10, *United States v. Aetna, Inc., et al.*, CA No. 16-1494 (Bates, J.) (D.D.C. Dec. 16, 2016) (emphasis added). This admission echoes HHS's recognition years earlier that *prompt* payment was essential. *See* Final RCP Rule, 77 Fed. Reg. at 17,238-17,239 (emphasis added) ("HHS would make payments to QHP issuers that are owed risk corridors amounts within a 30-day period after HHS determines that a payment should be made to the QHP issuer. *QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers.*").

The Government's only substantive response contorts basic actuarial science and ignores what everyone understood when the RCP was enacted. *See* Govt. Br. 33 n.16. The Government posits that full, annual payments would not have "stabilized" premiums. This is an extraordinary position, contradicting not only what the Government acknowledged 27 pages earlier—the RCP's premium-stabilizing purpose—but also the HHS's numerous post-enactment statements and throughout the life of the RCP.[9]

The ACA was imposed on an industry that operates on an annual cycle. Insurance premiums are set annually, regulatory reporting deadlines occur annually, taxes are paid

---

[9] *See, e.g.*, Patient Protection and Affordable Care Act; Standards Related to Reinsurance, Risk Corridors and Risk Adjustment ("Proposed RCP Rule"), 76 Fed. Reg. 41,930, 41,948 (July 15, 2011) (RCP "serves to protect against uncertainty in rate setting by qualified health plans sharing risk in losses and gains with the Federal government" and will do so by "limiting the extent of issuer losses (and gains)").

annually, commercial books and records are kept annually, and *the government itself budgets annually*.  An annual payment structure is the *only* way to mitigate risk sufficiently to prevent significant financial hardship to QHP issuers who, absent annual payment, treat unpaid RCP receivables as non-admitted assets, and endure the adverse impact of doing so on their financial solvency.[10]  Coupled with the unknown nature of the new and untested market that caused uncertainty with respect to premium setting, an open-ended RCP would have been tantamount to no RCP at all, as QHP issuers at the outset would have had to set higher premiums to account for the risk of non-annual payments, or declined to enter the market entirely, the very thing Congress designed the RCP to avoid.  Congress legislated with these practical and obvious realities in mind, and Congress underscored its intent by making the RCP "based on" the equivalent risk corridors program in Medicare Part D.  It is a basic tenet of statutory construction that Congress is presumed to be aware of how the agency administers it.  *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 184-85 (1988) ("We generally presume that Congress is knowledgeable about existing law pertinent to the legislation it enacts").  If Congress intended a different outcome— *i.e.*, for the ACA to *change* the key element of annual payments present in the Medicare Part D risk corridors program that Section 1342 was "based on"—surely it would have said so.[11]

HHS's administration of the RCP also undermines the Department of Justice's litigating position.  In practice, HHS has made payments on an annual basis, albeit incomplete payments.

_____

[10] *See* Nat'l Ass'n of Ins. Comm'rs, INT 15-01: ACA Risk Corridors Collectability (Nov. 5, 2015), *available at* http://www.naic.org/documents/committees_e_app_eaiwg_related _int_1501_risk_corridors.pdf.

[11] The Government's continued reliance on the CBO's omission of the RCP from its scoring remains unavailing.  *See* Pl.'s Br. 22 n.19.  The Government's effort to manufacture congressional intent from non-congressional pronouncements not contained in the laws themselves are precisely why legislative history usually "has no bearing; what matters is the law the Legislature *did* enact."  *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 403 (2010).

*See Health Republic*, 129 Fed. Cl. at 778 (pointing out that HHS has administered the RCP as an annual program). HHS's actions are illogical unless there is an obligation to pay annually.

If full RCP payments were due sometime after three years, *or maybe not at all*, they would not "stabilize" the market *or* "share" risk between insurers and the Government. "It is implausible that Congress meant the Act to operate in this manner." *King*, 135 S. Ct. at 2494.

### 2. The Government's "Three-Year" Framework Does Not Merit Deference.

The Government's claim that HHS's informal statements referencing a "three-year" framework are entitled to *Chevron* deference is misplaced. *See* Govt. Br. 17. First, deference is inappropriate because Congress spoke *directly* to the question of "when" payment was due by instructing HHS to administer the RCP on a "plan year" basis (based expressly on Medicare Part D): every year, upon calculation (no differently than when QHP issuers were required to make payments in). *See Chevron*, 467 U.S. at 842. In light of the ACA's statutory aims generally and the RCP's purpose specifically, both of which lend further support to this reading of Section 1342, the Court's analysis should end here.

Even if the statute were ambiguous, the Government totally ignores the *only* regulation promulgated by way of notice-and-comment rulemaking, which *specifically* addressed the RCP payment scheme's annual nature with reference to costs calculated on a benefit year basis. *See* 45 C.F.R. § 153.510. The Government cites instead to informal agency pronouncements (Govt. Br. 17) that are ***not entitled to Chevron deference***, as articulated in the Government's own principal case *Cathedral Candle Co. v. U.S. International Trade Commission*. 400 F.3d 1352, 1362-63, 1365 (Fed. Cir. 2005). That case, which the Government relies on, drew precisely this distinction between regulations promulgated following notice-and-comment rulemaking and informal agency pronouncements. *See id.*; *Gonzales v. Oregon*, 546 U.S. 243, 256-58 (2006).

The informal sub-regulatory statements cited by the Government are only entitled to limited "respect" to the extent that they have the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 139 (1944); *United States v. Mead Corp.*, 533 U.S. 218, 219 (2001). The "degree of deference depend[s] on the circumstances." *Cathedral Candle*, 400 F.3d at 1365; *Skidmore*, 323 U.S. at 139; *Mead*, 533 U.S. at 219.

Here, the Government cites to two guidance documents, while ignoring the Final RCP Rule and repeated HHS statements that *full payment* "is an obligation of the United States Government." Pl.'s Mot. Partial Summ. J. ("Pl.'s Br.") 10 n.10, 12-13 (¶¶ 6, 8, 9-14); Govt. Br. 17. The Government's position does not persuade because it undermines the RCP's entire premise and purpose, as noted *ante*. Moreover, the Government's "three-year" framework has none of the hallmarks of reasoned decision-making[12]: it (1) was *never* raised as part of the notice-and-comment rulemaking process, and is therefore procedurally defective; (2) is inconsistent with the agency's original position that both payments out and in should be subject to the same deadline because QHP issuers would expect prompt payment (and the agency has never explained its reversal);[13] and (3) was announced in response to Congress's efforts to defund the RCP, after HPIC set premiums.[14]

There are only two possible conclusions. Either HHS knowingly duped the industry in the rulemaking process by waiting until after the close of notice and comment on the Final Rule (and after insurers were already on the exchanges) to announce a different position, or, more

---

[12] *See Encino Motorcars, LLC v. Navarro*, 579 U.S. ___, slip op. at 9 (2016) (administrative rulemaking requires that "an agency must give adequate reasons for its decisions.").

[13] *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (agency must "display awareness that it is changing position" and demonstrate "good reasons for the new policy").

[14] *Cf. Sandifer v. U.S. Steel Corp.*, 678 F.3d 590, 599 (7th Cir. 2012) ("Naturally the Department of Labor does not acknowledge that its motive in switching sides was political; that would be a crass admission in a brief or in oral argument, and unlikely to carry weight with the judges.").

plausibly, HHS knew at the time it issued the Final Rule that payment was due annually, and only changed its mind when it came under political pressure.  *See* Pl.'s Br. 27-29.  Under either conclusion, the Government's *post hoc* announcement in informal guidance of a change in position is unpersuasive and does not merit deference.

### a.     *They lack validity.*

Even if the Government's characterization of the informal HHS pronouncements were accurate, such an interpretation would subvert the RCP's purpose to prevent an economic "death spiral" in which "premiums r[i]se higher and higher, and the number of people buying insurance s[i]nk lower and lower, [and] insurers beg[i]n to leave the market entirely."  *King*, 135 S. Ct. at 2486.[15]  HHS stated that the RCP is "designed to provide issuers with greater payment stability as insurance market reforms are implemented" and would "protect against uncertainty in the Exchange by limiting the extent of issuer losses (and gains)."  Proposed RCP Rule, 76 Fed. Reg. at 41,930-41,931.  The Government provides no rational explanation for how a non-annual program in which issuers may receive payment *at the end of three years* (or never) stabilizes premiums in each of those years.[16]  *See King*, 135 S. Ct. at 2496 ("Congress passed the [ACA] to improve health insurance markets, not to destroy them."); *see also N.Y. State Dep't of Soc. Servs. v. Dublino*, 413 U.S. 405, 419-20 (1973) ("We cannot interpret federal statutes to negate their own stated purposes."); *Cathedral Candle*, 400 F.3d at 1364 (rejecting interpretation "at odds with the purposes served by the regulation").

### b.     *They lack formality.*

The pronouncements' lack of formality also weighs against deference because a decision of

---

[15] *See Health Republic*, 129 Fed. Cl. at 775-76.

[16] Case in point:  insurance premiums rose 22 percent in 2017, attributable in part to "the fact that some of the programs meant to keep rates lower are ending at the end of this year" and many issuers "have either left the market or have had to raise their prices sharply to cover the cost of providing coverage."  *See supra* note 7.

this magnitude should have undergone notice-and-comment rulemaking.  Under the Administrative

Procedure Act ("APA"), "rules" are defined broadly as nearly any agency pronouncements that set

forth what regulated entities must or should do in the future and, with very limited exceptions (not

present here), they are subject to notice-and-comment rulemaking requirements.  5 U.S.C. §§

551(4); 553.  The bedrock principle underlying notice-and-comment rulemaking is that agency

decisions that will significantly affect the rights and duties of regulated parties should be subject to

public review and comment.  *See Chrysler Corp. v. Brown*, 441 U.S. 281, 302-03 (1979) (rules

"affecting individual rights and obligations" are subject to the APA's procedural requirements)

(citing *Morton v. Ruiz*, 415 U.S. 199, 232 (1974))).  For the reasons discussed above, a decision

that could determine the solvency or insolvency of insurers undoubtedly "affects individual rights

and obligations" sufficiently to merit public review and comment.

### c.      *They lack thoroughness of reasoning.*

For the same reasons, the informal agency pronouncements lack the thoroughness of

reasoning that is a hallmark of agency interpretations entitled to deference.  HHS's cursory

references to a three-year time period for making payments, after the close of notice-and-

comment, provide absolutely no reasoning supporting the policy.  *See Fox Television Stations*,

556 U.S. at 515; *Christopher v. SmithKline Beecham Corp.*, 567 U. S. ___, slip op. at 10 (2012)

(deference is inappropriate "when there is reason to suspect that the agency's interpretation does

not reflect the agency's fair and considered judgment.").  Rather, the bald statements cited by the

Government reflect quite the opposite:  an agency hamstrung by a frustrated Congress targeting

the ACA.  There is no administrative record, no questions and answers from the public, and no

statements whatsoever explaining why HHS adopted this *post hoc* three-year payment horizon.

### d.      *They contradict earlier statements without explanation.*

The absence of reasoned decision-making is particularly troubling because of the

agency's original, *directly contradictory* statement, during the rulemaking on HHS's implementing regulation, that "QHP issuers who are owed these amounts will want prompt payment, and payment deadlines should be the same for HHS and QHP issuers." Final RCP Rule, 77 Fed. Reg. at 17,238-17,239 (emphasis added). HHS then promulgated a regulation that says, unambiguously, insurers *will be paid* when the statutory conditions are satisfied. *See* 45 C.F.R. § 153.510. Its *post hoc* position that payments need not be paid annually was never broached during the rulemaking, and should be rejected here because "an agency's interpretation of a . . . regulation that conflicts with a prior interpretation is entitled to considerably less deference than a consistently held agency view." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987))); *cf. AT&T Corp. v. FCC*, No. 15-1059, slip op. at 14 (D.C. Cir. Nov. 18, 2016) ("An interpretation at odds with the agency's expressed intent at the time of adoption enjoys no judicial deference." (citing *Comcast Cable Commc'ns, LLC v. FCC*, 717 F.3d 982, 1003 (D.C. Cir. 2013))). The inconsistent and unacknowledged position reversal lacks the power to persuade.

### B. Section 1342 Required Full Payments Under its Statutory Formula.

#### 1. *Section 1342 Creates an Unconditional Right to RCP Payments.*

By the Government's rationale, "shall pay" means, at most, "shall pay *subject to the availability of appropriations,*" and that the only available appropriation was the "payments in" collected from insurers. Neither the text nor the purpose of Section 1342 supports the argument.

First, Congress stated that CMS "shall pay" QHP issuers—an unambiguous command to pay where the statutory triggers were met. Where Congress statutorily directs payment and leaves no discretion with the administering agency if the plaintiff can demonstrate that certain requirements have been met, the statute is money-mandating. *See Price v. Panetta*, 674 F.3d 674 F.3d 1335, 1339 (Fed. Cir. 2012); *Fisher v. United States*, 402 F.3d 1167, 1174-75 (Fed. Cir.

2005); *see also United States v. Mitchell*, 463 U.S. 206, 218 (1983) (recognizing Tucker Act jurisdiction over "claims founded upon statutes or regulations that create substantive rights to money damages"). Once a plaintiff identifies such a money-mandating statute, and establishes that it met the statutory requirements, it can secure judgment. Here, there is no question that HPIC met the statutory requirements.

Second, Congress also *omitted* from Section 1342 its typical words of limitation on an agency's budget authority to condition the "shall pay" command, such as "subject to appropriations" or "subject to the availability of appropriations." *See Prairie Cty., Mont. v. United States*, 113 Fed. Cl. 194, 199 (2013), *aff'd*, 782 F.3d 685 (Fed. Cir. 2015) ("[T]he language 'subject to the availability of appropriations' is commonly used to restrict the government's liability to the amounts appropriated by Congress for the purpose.") (quoting *Greenlee Cty., Ariz. v. United States*, 487 F.3d 871, 878-79 (Fed. Cir. 2007)). Section 1342's omission of these words of limitation is all the more instructive where Congress included it *in at least four other sections* of the ACA. *See, e.g.*, 42 U.S.C. §§ 280k(a), 300hh-31(a), 293k-2(e), 1397m-1(b)(2)(A). Had Congress intended Section 1342's obligation to be similarly limited, it would have said so.

Third, Congress did not condition "payments out" on "payments in." *See Moda*, 130 Fed. Cl. at 455-58. Accordingly, the *only* limitation on HPIC's right to a judgment is its ability to demonstrate that it performed as a QHP issuer on the exchanges and qualifies for RCP payments under the Section 1342 formula (as echoed in CMS's implementing regulation). *See Fisher*, 402 F.3d at 1176. As noted above, that HPIC did so is not in dispute.

DOJ's questioning of whether "full payment" may (or need) ever be paid, and its assertion that the RCP was intended to be a "self-funded" program (Govt. Br. 2), must be

rejected as a convenient litigating position.[17]  *HHS has acknowledged repeatedly that "full payment" is an obligation of the United States.  Pl.'s Br. 13 (¶¶ 9-14).[18]  Indeed, if HHS interpreted the RCP as self-funded (it did not), it would never calculate a "shortfall" at the end of the program because it would never owe anything beyond collections.  See id.* at 13-14 (¶¶ 9, 22)  HHS's "shortfall" concept thus exposes the fallacy of the Government's "self-funded" litigating position.

### 2.  *The Government's Liability Does Not Depend on an Appropriation.*

The Government argues that money-mandating statutory text cannot legally bind the United States absent an appropriation because the Appropriations Clause states that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law."  Govt. Br. 2 (quoting U.S. Const. art. I, § 9, cl. 7).  But DOJ's position confuses Congress's ability to *obligate* the United States with HHS's authority to *pay* that obligation.  A statutory liability (*i.e.*, obligation) may exist independently of an appropriation.  Courts have long recognized this fact:

> That provision of the Constitution is exclusively a direction to the officers of the Treasury, who are intrusted [sic.] with the safekeeping and payment out of the public money, and not to the courts of law; the courts and their officers can make no payment from the Treasury under any circumstances.
>
> **This court**, established for the sole purpose of investigating claims against the government, **does not deal with questions of appropriations, but with the legal liabilities incurred by the United States** under contracts, express or implied, **the laws of Congress**, or the regulations of the executive departments.  (Rev. Stat., § 1059.)  That **such liabilities may be created where there is no appropriation of money to meet them** is recognized in section 3732 of the Revised Statutes.

*Collins v. United States*, 15 Ct. Cl. 22, 35 (1879) (emphases added).

---

[17] The Government's assertion that the RCP would "eliminate" insurers' risk by "creating a government guarantee" (Govt. Br. 32) is a canard.  By design, even full RCP payments would not eliminate HPIC's losses or come anywhere close to guaranteeing a profit—the RCP mitigates loss by paying back a percentage of the losses; *it does not make insurers whole or profitable*.

[18] To be clear, HPIC is not suggesting that agency pronouncements gave rise to HPIC's right to payment.  That right arises from the statute itself.  *See supra* Part II; Pl.'s Br. 19-40.

If Congress intended payments out to be subject to an appropriation or payments in, surely it would have said so.  In at least four other ACA sections, Congress inserted "subject to the availability of appropriations" but expressly omitted such language from Section 1342.  42 U.S.C. §§ 280k(a), 300hh-31(a), 293k-2(e), 1397m-1(b)(2)(A).[19]  The Government's case authorities glossing over Congress's omission are unavailing.  Its featured case, *Prairie County, Montana v. United States*, addressed a statute that, unlike Section 1342, ***expressly*** made the Government's obligation "subject to the availability of appropriations."  *Compare* Govt. Br. 23-24 *with* 782 F.3d 685, 687-88 (Fed. Cir. 2015) ("the [statute's] plain language . . . limits the government's liability . . . to the amount appropriated by Congress.").  The Government has failed to articulate any plausible reason why Section 1342 should be read differently.

The Government's position is peculiar because the RCP is "based on" the Part D RCP, which is universally acknowledged as *not* budget neutral.  Tellingly, even HHS—*outside of litigation*—agrees Section 1342 was not intended to be budget neutral.  *See* Pl.'s Br. 10 n.10, 13.

*OPM v. Richmond* does not help the Government—indeed, that case actually makes HPIC's point.  There, the Supreme Court counseled that "[a] law that identifies the source of funds is not to be confused with the conditions prescribed for their payment.  Rather, funds may be paid out only on the basis of a judgment based on ***a substantive right to compensation based on the express terms of a specific statute.***"  *OPM v. Richmond*, 496 U.S. 414, 432 (1990) (emphasis added).  Section 1342 is just such an express, substantive right to compensation.[20]

---

[19] HHS's recognition that RCP was not intended to be budget neutral while the other two premium stabilization programs were, underscores the point.  45 C.F.R. § 153.230(d) (reinsurance program will be budget neutral); HHS Notice of Benefit and Payment Parameters for 2014, 78 Fed. Reg. at 15,441 (Risk Adjustment methodology provides for a "budget-neutral revenue redistribution among issuers.").

[20] The Supreme Court and Federal Circuit have held that a claimant need only establish a substantive source of law mandating payment.  *Mitchell*, 463 U.S. at 216-17; *Slattery*, 635 F.3d

The Government relies on the absence from Section 1342 of certain language found in Medicare Part D relating to an agency's "budget authority in advance of appropriations" as proof that Congress did not intend to give HHS equivalent authority to obligate the United States under Section 1342. *See* Govt. Br. 19-21. But the "in advance of appropriations" language has nothing to do with *Congress's own power* to obligate the United States, as it did in Section 1342. Precisely because Congress has "the power of the purse," it can mandate payment irrespective of whatever additional authority it vests in an agency to obligate the Government on its own. There is no question Congress can obligate the United States by substantive legislation to pay money. *See Mitchell*, 463 U.S. at 218; *Collins*, 15 Ct. Cl. at 35. That is precisely what Congress did in Section 1342. *Slattery* flatly rejects the position that the United States is only liable for financial obligations if the subject agency has been funded by an appropriation. 635 F.3d at 1317-21.

The Government's citation to *Nevada v. Department of Energy* for the proposition that a plaintiff seeking to enforce a money-mandating statute must identify not just a "command" but also "an appropriation" is inapposite. *See* Govt. Br. 23. That case was brought in federal district court challenging the reasonableness of the Department of Energy's refusal to pay out more than its appropriation allowed. That's not the issue here—HPIC has not sued HHS for arbitrarily and capriciously refusing to pay. Obviously, its own budget authority was curtailed by the 2015 and 2016 Spending Laws. But the debts of the United States are the debts of the United States, not the debts of HHS. It makes no difference for purposes of this Court's interpretation of Section 1342 whether HHS itself was authorized to make payment; it matters only whether *Congress* bound the United States to certain obligations when insurers performed and qualified for payments by virtue of experiencing sufficient higher-than-expected costs on the exchanges.

at 1321.

Furthermore, to the extent that HHS's Section 1342 budget authority is relevant to the inquiry, the Government's invocation of the Anti-Deficiency Act ("ADA") and Congressional Budget Act for the proposition that HHS may not incur obligations without advance budget authority or a dedicated appropriation is off the mark. *See* Govt. Br. 23 (citing 2 U.S.C. § 622(2)(A)); *id.* at 27. In arguing that the ADA constrained HHS, the Government has relied on the ADA provision that prohibits an agency from making or authorizing an expenditure or obligation "exceeding an amount available in an appropriation or fund for the expenditure or obligation." Govt. Br. 27 (citing 31 U.S.C. § 1341(a)(1)(A)). The Government is relying on the wrong ADA section. That section prohibits agencies from paying obligations where Congress has specifically capped the amount that can be spent on a program. The ADA imposes fiscal restraints on agencies; *it does not apply to Congress.* Indeed, that statute itself makes clear (as it must) that its prohibitions on agency authority to incur obligations on the Government's behalf fall away where "authorized by law," *i.e.*, where Congress says otherwise. *See* 31 U.S.C. § 1341(a); *accord* II GAO, Principles of Fed. Appropriations Law ["GAO Redbook"], at 6-91 (3d ed. 2006) ("Congress may expressly state that an agency may obligate in excess of the amounts appropriated, or it may implicitly authorize an agency to do so *by virtue of a law that necessarily requires such obligations*.") (emphasis added), *available at* https://www.gao.gov/legal/red-book/overview. As GAO has opined, there is

> no legal requirement for specific appropriation authorization language, although the use of such language certainly serves to remove any doubt as to whether an authorization of appropriations is intended. ***Rather, the enactment of general legislation which clearly contemplates Federal financing is sufficient authorization for appropriations to carry out such legislation.***

Hon. George E. Danielson, B-173832 (Comp. Gen. Aug. 1, 1975). That is what Congress did.

The ADA provision relied upon by the Government and the cases applying it[21] are inapposite because nothing in Section 1342 imposes a cap on RCP payments. That is the point: Section 1342's "shall pay" mandate is unconditional. *See, e.g.*, *Moda*, 130 Fed. Cl. at 455 ("Section 1342 simply directs the Secretary of HHS to make full 'payments out.' Therefore, full payments out he must make."). Rather, the appropriate ADA provision to consider is the one that prohibits an agency from involving the Government "in a contract or obligation for the payment of money before an appropriation is made *unless authorized by law*." 31 U.S.C. § 1341(a)(1)(B) (emphasis added). Medicare Part D is one example of a law authorizing the agency to obligate the Government without an appropriation (granting budget authority "in advance of appropriations"). Section 1342—a money-mandating statute—is another. *See Moda*, 130 Fed. Cl. at 455 (rejecting Government's argument that the lack of express budget authority "in advance of appropriations" as found in Medicare Part D was determinative, pointing out that "[t]he stronger payment language in Section 1342 obligates the Secretary to make payments and removes his discretion, *so a further payment directive to the Secretary is unnecessary*") (emphasis added).

Not surprisingly, this is consistent with what HHS understood Section 1342 to require, as demonstrated by its many public statements about its payment obligations under Section 1342. Even after it announced in spring 2014 that it would try to administer the RCP in a budget-

---

[21]  In *Highland Falls-Fort Montgomery Cent. Sch. Dist. v. United States*, the substantive statute mandated that qualifying entities "shall be entitled" to payment but also expressly dictated how the Government should allocate funds in the case of insufficient annual appropriations, and Congress subsequently specifically "earmarked" the *precise* amount of funds, indicating an intent to repeal. 48 F.3d 1166, 1168 (Fed. Cir. 1995) (quoting 20 U.S.C. §§ 237(a) & 240(c)); *id.* at 1170. In *Star-Glo Associates, LP v. United States*, Congress expressly limited payments under a statutory program compensating citrus growers for destroyed citrus groves—"[t]he Secretary of Agriculture shall use $58,000,000 of the funds of the Commodity Credit Corporation to carry out this section, to remain available until expended"—thereby expressly legislating a statutory cap. 414 F.3d 1349, 1354-55 (Fed. Cir. 2005) (quoting Pub. L. No. 106-387, 810(e) (2000)).

neutral manner, HHS repeatedly acknowledged that *full payment* remained due to QHP issuers. *See, e.g.*, Exchange and Insurance Market Standards for 2015 and Beyond, 79 Fed. Reg. 30,240, 30,260 (May 27, 2014) (emphasis added) ("HHS recognizes that the Affordable Care Act requires the Secretary to make ***full payments*** to issuers . . .") (emphasis added). HHS repeated that acknowledgement. *See* Pl.'s Br. 10 n.10.[22]

Finally, the Government misses the mark in addressing the Judgment Fund because it is irrelevant to the question of the Government's *liability*. The Government makes the counterfactual assertion that there must be an annual appropriation in order for there to be a liability on which this Court may render judgment. That is not correct. Where liability stems from an unqualified money-mandating statute, the existence of an appropriation is only relevant *after* this Court enters judgment against the United States. In that event, the political branches of Government—not the Court of Federal Claims—must determine how to pay the judgment, an action that requires an appropriation. That appropriation can either be specific to the judgment in question, or it can come out of the Judgment Fund—a permanent appropriation specifically for the purpose of paying judgments for which there was no other appropriation. *See* 31 U.S.C. § 1304(a)(1); *Slattery*, 635 F.3d at 1303. Either way, it is not the concern of this Court when considering whether to render judgment in the first instance on the Government's liability. *See* Pl.'s Br. 40; *accord Collins*, 15 Ct. Cl. at 35 ("The officers of the Treasury have no authority to pay such compensation until appropriations therefor are made[.] . . . The liability, however, exists independently of the appropriation, and may be enforced by proceedings in this court.").

---

[22] That HHS has been acknowledging the Government's RCP obligations and recording them as requiring full payment shows that it understood its Section 1342 and Medicare Part D authorities to be functionally equivalent. While HHS's actions do not create the obligation (Section 1342 does), they certainly "evidence[] the obligation." II GAO Redbook at 7-8 (3d ed. 2006); *see also id.* at 7-43 (non-discretionary expenditures "*imposed by law*" should be recorded as "obligations").

### 3.    *The Later Spending Laws Did Not Defuse the Payment Obligations.*

The Government places great weight on the 2015 and 2016 Spending Laws, arguing at once that they either confirmed Congress intended no such liability or at the very least abridged the Government's RCP liability.  This position is wrong for at least two reasons.

First, where the Government's liability does not depend on a specific appropriation, a later Congress's restriction on *HHS's ability* to make RCP payments is legally irrelevant.  With respect to payments due to insurers under Section 1342, Congress's later actions did not abridge the obligation *of the United States*, nor could they have.  At most, they affected only the source of payment.  The Government's liability exists independently of HHS's own budget authority to make the payments due and continues to exist, undisturbed, as an obligation of the United States, a point that HHS itself (as noted above) has acknowledged on multiple occasions.

Second, and in any event, as HPIC has extensively briefed, the Spending Laws on their face did not abrogate the RCP's clear statutory mandate to make full payments.  Pl.'s Br. 34-40.

The Government gives short shrift to the serious disruption its position would cause vested rights.  As HPIC briefed, the GAO Redbook clearly distinguishes between when obligations (even unmatured ones) arise and when those obligations are paid.  Pl.'s Br. 33-34.  HPIC's right to RCP payments were fully vested before Congress curtailed the sources of those payments because HPIC had completed all of its statutory requirements and its commitment to participate on the exchanges was fixed and irrevocable *before Congress passed the Spending Laws.*  Months before December 16, 2014, when Congress enacted the 2015 Spending Law (for the first time curtailing CMS's authority to fund 2014 RCP obligations), HPIC had nearly completed performance for the 2014 benefit year and submitted premiums, complied with all requisite regulatory requirements, and executed QHP agreements for the 2015 benefit year.  Likewise, Congress did not enact the 2016 Spending Law (curtailing CMS's authority to fund

2015 RCP obligations) until December 18, 2015, by which point HPIC had nearly completed

performance for the 2015 plan year and had already committed to benefit year 2016.

The Government's obligation to pay HPIC arose before the Spending Laws curtailing

their payment sources were enacted. Depriving HPIC of its right to RCP payments, after it had

provided insurance under a statutory scheme in which such payments had been guaranteed

"'would impair rights a party possessed when [it] acted . . .'" and impose new rules on a

transaction already completed. *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006) (quoting

*Landgraf v. USI Film Prods.*, 511 U.S. 244, 280 (1994)). Such retroactive application of statutes

is "disfavored," and thus "it has become 'a rule of general application' that 'a statute shall not be

given retroactive effect unless such construction is required by explicit language or by necessary

implication.'" *Id.* at 37 (quotation omitted). Moreover, a statute "ought never to receive such a

[retroactive] construction if it is susceptible of any other. It ought not to receive such a

construction unless the words used ***are so clear, strong, and imperative that no other meaning***

***can be annexed to them, or unless the intention of the legislature cannot be otherwise***

***satisfied***." *U.S. Fid. & Guar. Co. v. United States*, 209 U.S. 306, 314 (1908) (emphasis added).

The Spending Laws evince no retroactivity. Pl.'s Br. 34-40.[23]

## III.   THE GOVERNMENT IS LIABLE FOR BREACH OF THE IMPLIED-IN-FACT CONTRACT BETWEEN IT AND HPIC (COUNT II).

The Government heavily relies on *Lincoln* to argue that Section 1342 does not constitute

an implied-in-fact contract but it ignores HPIC's allegations to the contrary based on the

---

[23] Moreover, they have a clear and obvious "other meaning," as adopted by Plaintiff's cases: that Congress, whatever some of its members desired, managed only to pass laws that prohibited RCP payments from particular sources for particular years. *See Moda*, 130 Fed. Cl. at 466 ("After all, 'to say to Moda, "the joke is on you. You shouldn't have trusted us," is hardly worthy of our great government.'") (modifications omitted) (quoting *Brandt v. Hickel*, 427 F.2d 53, 57 (9th Cir. 1970)). In addition, although Section 1342 directly obligated full payments under its statutory conditions without regard to a dedicated appropriation, appropriations ***were unquestionably available***. *See* Pl.'s Br. 32-33 (citing *Moda*, 130 Fed. Cl. at 456).

surrounding circumstances, including the Government's conduct, both at the time of statutory

formation and thereafter.  The Government held out a unilateral offer of RCP payments to induce

QHP issuers, including HPIC, to begin performance.  After QHP issuers accepted by beginning

performance, HHS received the benefits of expanded and affordable coverage for millions of

Americans.  HHS's failure to uphold its side of the bargain is a textbook contractual breach.

This Court has jurisdiction over implied contract claims, 28 U.S.C. § 1491(a)(1), with the

Judgment Fund available for payments.  *Slattery*, 635 F.3d at 1303, 1317-21.  All elements of an

implied contract are met here,[24] and HPIC is entitled to the contractually-obligated amounts.

### A.      There Was Mutuality of Intent.

The Government contracts when its conduct or language "allows a reasonable inference"

that it intended to.  *ARRA Energy Co. I v. United States*, 97 Fed. Cl. 12, 27 (2011).  The

surrounding circumstances include the statutory purpose, context, legislative history, or any other

objective indicia of actual intent.[25]  HPIC's well-pled facts show that the combination of Section

1342, HHS's implementing regulations, and the Government's conduct (before and after Plaintiff

agreed to become a QHP) support that the "conduct of the parties show[ ], in the light of the

surrounding circumstances, their tacit understanding."  *Hercules, Inc. v. United States*, 516 U.S.

---

[24] Implied contracts require:  (1) mutuality of intent; (2) unambiguous offer and acceptance; (3) consideration; and (4) actual authority of the Government contracting representative, or ratification.  *Lewis v. United States*, 70 F.3d 597, 600 (Fed. Cir. 1995).

[25] *See, e.g.*, *Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co*., 470 U.S. 451, 468 (1985); *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17-18 (1977) (while the statute did not expressly state an intent to contract, it was "properly characterized as a contractual obligation" when considering the purpose of the agreement and the fact that the Government "received the benefit they bargained for"); *Prudential Ins. Co. of Am. v. United States*, 801 F.2d 1295, 1297 (Fed. Cir. 1986) (an implied-in-fact contract "is not created or evidenced by explicit agreement of the parties, but is inferred as a matter of reason or justice from the acts or conduct of the parties"); *Nat'l Educ. Assoc.-R.I. v. Ret. Bd. of R.I. Emps.' Ret. Sys.*, 890 F. Supp. 1143, 1152 (D.R.I. 1995) (quoting *U.S. Trust Co.*, 431 U.S. at 17 n.14) ("[T]his Court is not limited to an examination of statutory language when it determines whether a statute amounts to a contract," but also should evaluate "the circumstances").

417, 424 (1996); *see, e.g.*, Amend. Compl. ¶¶ 4-10, 65-66, 74-75, 87-88.

The Government distorts this longstanding test by contending that this intent to contract *must be expressly stated* in the statute. DOJ, without citation, asks this Court to be the first to create this narrow holding by pointing to cases that contain no such express language.[26] The Government asserts that the *Radium Mines* statute "clearly expressed" an intent to enter into a contract. Govt. Br. 44. However, *Radium Mines* did not turn on an express reference to a possible contract but focused instead on the regulations' "promissory" nature. *Baker v. United States*, 50 Fed. Cl. 483, 490 (2001). The Supreme Court agreed, describing *Radium Mines* as a case "where contracts were inferred from regulations promising payment" for Tucker Act jurisdiction purposes. *Army & Air Force Exch. Serv. v. Sheehan*, 456 U.S. 728, 739 n.11 (1982).

Further, the Government attempts to undermine Judge Wheeler's decision in *Moda* as a "sweeping new rule for inferring congressional intent to contract based on a statute's structure." Govt. Br. 45. But the opposite is true: *Moda* fits squarely within controlling precedent while the Government would create a "new rule." It contends that considering the statute's structure— instead of the text and legislative history—is inconsistent with *Brooks v. Dunlop Mfg., Inc.*, 702 F.3d 624 (Fed. Cir. 2012). This violates the plain meaning rule. Further, *Brooks* is inapposite; unlike Section 1342, which obligated the Government to make RCP payments once insurers performed (by offering QHPs and experiencing the requisite annual losses), the statute in *Brooks* imposed no obligation—it lacked mutuality, avenue for acceptance, and consideration.

The Government's other cases are also distinguishable. The *ARRA Energy* plaintiff rested its unsuccessful contract claim solely upon the statute itself, whereas HPIC relies upon a

---

[26] Moreover, *even if* they did, the longstanding legal test for inferring mutuality of intent is not tacitly modified by the mere factual vagaries of certain cases.

raft of HHS assurances.[27]  *See* 97 Fed. Cl. at 27.  Likewise, in *AAA Pharmacy, Inc. v. United States*, 108 Fed. Cl. 321 (2012), the plaintiff alleged an implied right to specific *procedures* for a Medicare billing appeal, which differs sharply from the mutuality of intent to actually *agree*, in this case, to RCP payments in exchange for expanded coverage at low-costs.

B. **There Was Offer and Acceptance.**

The Government *offered* RCP payments to insurers through the language of the ACA, regulations, and HHS' numerous publications and affirmations.  Insurers then *accepted* this offer by beginning performance and providing QHP services, thus executing an enforceable unilateral contract.  Specifically, HPIC accepted the Government's offer by complying with the numerous and extensive QHP administrative requirements and actually serving the high-cost, at-risk population of formerly uninsured individuals.  Courts have found such exchange to constitute unambiguous offer and acceptance even in the absence of any explicit reference to an offer or contract.[28]  The Government's reliance on *Land of Lincoln* to argue otherwise is meritless.

C. **There Was Consideration.**

Consideration at the time of formation flowed both ways.  QHP issuers are the backbone of the Government's effort to provide affordable and comprehensive coverage through the Exchanges and, *but for* the Government's promise of risk stabilization, insurers would not have offered plans with such restrictive and elaborate conditions, whose financial viability had never before been tested.  When HPIC agreed to offer QHPs, the Government and HPIC committed to

---

[27] These HHS assurances include:  implementing regulations that made payments mandatory; accompanying preamble promising to pay regardless of the amounts collected; transitional policy that sharply increased the costs of health care coverage, and which led HHS to expressly reaffirm the availability of RCP payments to offset those costs; and HHS's repeated promises to pay.

[28] *Radium Mines, Inc. v. United States*, 153 F. Supp. 403, 405-06 (Ct. Cl. 1957) (risk stabilization and minimum prices constituted offer which "induced" companies to accept through performance); *N.Y. Airways v. United States*, 369 F.2d 743 (Ct. Cl. 1966) (finding published "board rate" for aviation transportation services constituted an offer that plaintiff accepted through performance).

an intricate set of specific, reciprocal obligations.[29]  The Government benefitted by HPIC's

servicing of formerly uninsured, high-cost enrollees at reasonable premiums (that accounted for

anticipated RCP risk-sharing) in compliance with its extensive QHP standards.  Indeed, the

calculation of RCP payments is based on the costs incurred by QHP issuers to provide those

benefits.  In exchange, HPIC received consideration because HHS committed that *only* QHPs

would receive RCP payments (to the exclusion of other insurers), 45 C.F.R. § 153.510, and that

HHS would make timely and full RCP payments.  *Ace-Federal Reporters, Inc. v. Barram*, 226

F.3d 1329, 1332 (Fed. Cir. 2000) (Government buying from "between two and five authorized

sources," to the exclusion of others, was "consideration" with "substantial business value.").

### D.      The Secretary of HHS Had Actual Authority to Contract.

Actual authority to contract can be express or implied—either is sufficient to bind the

Government.  *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989).  Agency

Heads have contract-making authority "by virtue of their position."  48 C.F.R. § 1.601(a)

(contractual authority in each agency flows *from* the Agency Head to delegated officials).[30]

Moreover, Section 1342's instruction that the Secretary "shall establish" the RCP and

"shall pay" RCP payments, along with the Secretary's broad obligation to administer and

---

[29]  These include submission of, or compliance with, Government standards regarding:  (1)
"issuer participation" (45 C.F.R. § 156.200); (2) detailed rate and benefit submissions (45 C.F.R.
§ 156.210); (3) enrollment data, claims payment policies and practices, and periodic financial
disclosures (45 C.F.R. § 156.220); (4) a provider network that meets federal standards (45 C.F.R.
§ 156.230); (5) enrollment of individuals during specified enrollment periods (45 C.F.R. §
156.260); (6) standards governing termination of coverage or enrollment (45 C.F.R. § 156.270);
(7) reporting of prescription drug distribution and costs (45 C.F.R. § 156.295); and (8) cost-
sharing reductions and monitoring of cost-sharing payment requirements (45 C.F.R. § 156.410).
[30] *Accord United States v. Winstar Corp.*, 518 U.S. 839, 890 n.36 (1996) ("The authority of the
executive to use contracts in carrying out authorized programs is . . . generally assumed in the
absence of express statutory prohibitions or limitations." (quoting 1 R. Nash & J. Cibinic,
Federal Procurement Law 5 (3d ed. 1977)));  *H. Landau*, 886 F.2d at 324 (authority to bind the
Government "is generally implied" where such authority is integral to execute program duties).

implement the ACA,[31] give the Secretary the express (or at least implied) authority to enter into binding QHP agreements to implement the ACA. *See Winstar Corp.*, 518 U.S. at 890 n.36; *H. Landau*, 886 F.2d at 324. Coverage through Exchanges is carried out exclusively through private insurers' QHPs, and the ability to contract with them is "integral" to the Secretary's ability to effectuate her statutory duty to implement the RCP. *See id.* Indeed, where contracts have been inferred from statutes promising payment, the Government's authority to contract is clear. *See, e.g.*, *Radium Mines*, 153 F. Supp. at 405-06; *N.Y. Airways*, 369 F.2d at 751-52.

The Government's assertion that the ADA (31 U.S.C. § 1341(a)(1)(B)) requires otherwise is erroneous. First, the Secretary *did* have authority to make RCP payments under CMS's "Program Management" appropriation and the amounts collected under the RCP, as determined by GAO, whose opinions are given "special weight." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005); GAO, B-325630, HHS—Risk Corridors Program, 3-5 (Sept. 30, 2014), *available at* http://gao.gov/assets/670/666299.pdf. Second, *even if* no appropriated funds were available (they were), the resulting implied contract would not *ipso facto* violate the ADA. *See, e.g.*, *California v. United States*, 271 F.3d 1377, 1383-84 (Fed. Cir. 2001) (Interior Secretary entered into a binding contract, which was not *ultra vires* despite the fact that "[n]o funds were appropriated" and Congress likely did not "contemplate a breach-of-contract claim arising from [the statute]," because Congress "expressly authoriz[ed] the Secretary . . . to negotiate and enter into *an agreement* . . . ."). Here, similarly, the ACA expressly authorized the HHS Secretary to (1) enter into QHP *agreements* with insurers, and (2) to "establish and administer" the RCP program in which the Secretary "shall pay" RCP funds. Per precedent, the Secretary had actual authority (by position) and was impliedly authorized (by statute) to enter into binding

---

[31] *See* ACA §§ 1001, 1301(a)(1)(C)(iv), 1302(a)-(b), 1311(c)-(d).

agreements, regardless of appropriations, and the resulting agreements were not *ultra vires*.

Third, the Government conflates HHS's "actual authority" (to enter into binding agreements) with whether the QHP contracts potentially conflicted with the ADA. But "actual authority" exists as a function of position, 48 C.F.R. § 1.601(a); its existence does not flow from whether a particular action complied with all statutory and regulatory requirements in existence. *Even if* entering into this QHP contract violated the ADA (it did not), the Secretary's unauthorized commitment still *binds* the Government unless the illegality (vis-a-vis the ADA) was patent and "palpably illegal." *John Reiner & Co. v. United States*, 325 F.2d 438, 440 (Ct. Cl. 1963) ("[T]he court should ordinarily impose the binding stamp of nullity only when the illegality is plain."); *Trilon Educ. Corp. v. United States*, 578 F.2d 1356, 1360 (Ct. Cl. 1978) ("[Government] officers must find their way through a maze of statutes and regulations . . . . It would be unfair for [contractors] to suffer for every deviation . . . . [T]he court has preferred to allow the contractor to recover on the ground that the contracts were not palpably illegal to the [contractor's] eyes."). Here, the ACA's express authorization for the Secretary to enter into QHP agreements and "establish," "administer," and "pay" RCP amounts to insurers demonstrate clear authority; the alleged conflict with the ADA was not "palpably illegal" because an ADA violation, if any, requires a complex analysis of Government accounting that Contractors unquestionably lacked insight into at the time that they "accepted" by beginning performance. The Government's arguments that the HHS Secretary lacked actual authority are misplaced.

Lastly, even accepting an ADA violation, *arguendo*, HPIC is *still* entitled to payment because the implied contract would be void, the Court would retain jurisdiction, and HPIC would be entitled to *quantum valebant* for the value of the QHP services conferred.[32] This entitlement,

---

[32] *See Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 561 (Ct. Cl. 1978); *Aero*

even if different than the pled amount, still warrants rejection of the instant 12(b)(6) motion.

### E. Congress Cannot Abrogate Contractual Liability through Appropriations.

Congress cannot curtail the Government's contractual liability through the appropriations process. *Salazar v. Ramah Navajo Chapter*, 132 S. Ct. 2181, 2189 (2012); *Cherokee Nation of Okla. v. Leavitt*, 543 U.S. 631, 646 (2005). This applies "even if an agency's total lump-sum appropriation is insufficient to pay all the contracts the agency has made." *Cherokee Nation*, 543 U.S. at 637. When an agency lacks appropriations, "the Government's 'valid obligations will remain enforceable in the courts.'" *Ramah*, 132 S. Ct. at 2189 (citing II GAO Redbook at 6-17 (2d ed. 1992)).

HPIC's implied contract claim falls neatly within this line of cases. As in *Ramah*, Congress provided some funding to meet contractual obligations, but not enough to fully satisfy those obligations. The Government does not argue otherwise. HPIC seeks payment for contractually-obligated amounts, and the Judgment Fund is available to pay this judgment.

In any event, the sole, instant issue on this claim is the Motion to Dismiss pursuant to Rule 12(b)(6). The Court must take HPIC's well-pled allegations as true with all reasonable inferences in its favor for purposes of deciding the government's Motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) ("a judge must accept as true all of the factual allegations contained in the complaint."). By any rational measure, drawing all reasonable inferences in HPIC's favor and accepting all allegations as true, HPIC has stated a claim on which relief can be granted.

## IV. CONCLUSION

For the reasons set forth above, HPIC respectfully requests that the Court (i) GRANT its Motion for Partial Summary Judgment, and (ii) DENY the Government's Motion to Dismiss.

---

*Union Corp. v. United States*, 47 Fed. Cl. 677, 680-81 (2000).

Dated:  April 28, 2017

OF COUNSEL:
Daniel Wolff, Esq.
Xavier Baker, Esq.
Skye Mathieson, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004

Respectfully submitted,

*/s/ Stephen McBrady*
Stephen McBrady, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116
SMcBrady@crowell.com

*Attorney for HPHC Insurance Co., Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 28, 2017, a copy of the forgoing "Plaintiff's Reply in Support of Its Motion for Partial Summary Judgment and Opposition to Defendant's Cross Motion to Dismiss" was filed electronically using the Court's Electronic Case Filing (ECF) system.  I understand that notice of this filing will be served on Defendant's Counsel, Marcus Sacks, via the Court's ECF system.

*/s/ Stephen McBrady*
Stephen McBrady, Esq.
CROWELL & MORING LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel:  (202) 624-2500
Fax:  (202) 628-5116
SMcBrady@crowell.com